760 So.2d 903 (2000)
Fred Lewis WAY, Appellant,
v.
STATE of Florida, Appellee.
No. SC78640.
Supreme Court of Florida.
April 20, 2000.
Rehearing Denied June 15, 2000.
*906 Gregory C. Smith, Capital Collateral CounselNorthern Region, Heidi E. Brewer, Assistant CCRC and David F. Chester, CCRC Staff AttorneyNorthern Region, Tallahassee, Florida; and James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella and Robert A. Krauss, Assistant Attorneys General, Tampa, Florida, for Appellee.
PER CURIAM.
Fred Lewis Way appeals a sentence imposing the death penalty following a resentencing proceeding and the trial court's denial of post-conviction relief following an evidentiary hearing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
The facts of this case are set forth in our previous opinions. See Way v. Dugger, 568 So.2d 1263 (Fla.1990) (Way II); Way v. State, 496 So.2d 126 (Fla.1986) (Way I). On July 11, 1983, a fire occurred in the garage of the home occupied by the defendant, Fred Lewis Way, and his family. Both his fifteen-year-old daughter, Adrienne Way, and his wife, Carol Way, were found dead in the garage.
The state presented evidence that Way, who was having marital difficulties, argued with his wife in the garage of their Tampa home, ultimately striking her in the head with a hammer. He called Adrienne into the garage and also struck her in the head with a hammer. He then set both mother and daughter, and the garage, on fire.
Way II, 568 So.2d at 1264.
At trial, the medical examiner testified that Carol had suffered twelve traumas to the skull that had been caused by a blunt instrument, such as a hammer. Adrienne had suffered two similar blows to the head, the second of which was severe enough to crack her skull. Expert witnesses for the State testified at trial that the fire was intentionally set and gasoline had been used as the primary accelerant. See id. The cause of death for both victims was blunt trauma and 100% body burns, either of which could have caused their deaths. See Way I, 496 So.2d at 127.
At trial, Way's surviving daughter Tiffany testified that her mother and father had been in the garage together when Way called Adrienne into the garage. Moments later, Tiffany heard Adrienne screaming in the garage. When Tiffany looked out her bedroom window, she saw a fire in the garage. However, her father did not respond when Tiffany asked whether she should call the fire department.[1]
*907 Witnesses to the fire also testified that Way did not respond to questions concerning whether anyone was in the burning garage. After hearing screams from inside the garage, Way answered that his daughter was in the garage. A witness also saw a body[2] engulfed in flames attempting to rise up on all fours as if to crawl out of the burning garage and then finally collapsing. See Way II, 568 So.2d at 1265. The jury, rejecting Way's defense that the mother and daughter were killed while engaged in mutual combat, found Way guilty of second-degree murder in the killing of Carol Way, but guilty of first-degree murder for the killing of Adrienne as well as first-degree arson. In accordance with the jury's seven to five recommendation, the trial court imposed the death penalty for the murder of Adrienne Way. The trial court also imposed a sentence of ninety-nine years' imprisonment for the second-degree murder conviction and a thirty-year sentence for the first-degree arson conviction. This Court affirmed the convictions and sentences on direct appeal. See Way I, 496 So.2d at 129.
The trial court denied Way's first motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850,[3] which this Court affirmed on appeal. See Way II, 568 So.2d at 1266-67. However, we granted a writ of habeas corpus, vacated the death sentence and remanded for resentencing as required by Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), because the error that occurred when the jury was not instructed that it could consider nonstatutory mitigation was not harmless beyond a reasonable doubt.[4]See Way II, 568 So.2d at 1266-67.
Prior to the resentencing proceeding, Way filed an emergency 3.850 motion in the trial court alleging that photographs withheld from the defense showed that the fire had been started by an "accidental propane gas explosion" instead of having been intentionally set by Way using gasoline. Way v. State, 630 So.2d 177, 178 (Fla.1993) (Way III). The trial court summarily denied relief on the 3.850 motion and proceeded with the resentencing.
The jury again recommended the imposition of the death penalty by a vote *908 of seven to five. The trial court imposed the death penalty after finding that the applicable statutory aggravating circumstances[5] outweighed the statutory mitigating[6] and nonstatutory mitigating[7] circumstances. On appeal of the resentencing proceedings and the summary denial of the postconviction motion, we remanded for an evidentiary hearing to determine
whether there was an improper withholding of the photographs and whether, even if there was, it would have affected the outcome of Way's trial. We are unable to conclusively determine from the record that this "new" evidence could not support an alternative theory of the deaths of his wife and daughter and provide a basis on which a jury could find him innocent.
Id. at 178-79. We withheld ruling on the issues raised in Way's direct appeal of the resentencing proceedings. See id. at 179. After holding an evidentiary hearing, the trial court denied relief on the Brady[8] claim and this appeal follows.
In the present appeal, Way raises three issues on appeal from the denial of postconviction relief[9] and eight issues remain outstanding from his appeal of the imposition of the death penalty in the resentencing proceedings.[10] We first address the trial court's denial of Way's Brady claim.

BRADY CLAIM
The evidence presented at the evidentiary hearing centered on two photographs that Way asserted had been suppressed by the State in violation of Brady. One photograph showed the condition of the circuit breaker box following the fire. A number of circuit breakers had been tripped and black lines radiated out of the panel. The second photograph of the garage after the *909 fire showed a weight bench with a broken leg extension bar.
The photographs had been taken by Henry Regalado, an arson investigator who had conducted an arson investigation the day following the fire for a private company. The defense claimed that the photograph of the circuit breaker box would have supported a defense that the fire was accidentally started and the photograph of the weight bench would have provided an explanation of Adrienne's head wounds.
In order to support the Brady claim, the defense presented the testimony of Eleanor Posey, an expert in electrical engineering and forensic fire examination, who testified that in her opinion the photograph of the electrical panel when viewed in conjunction with the other evidence at the scene refuted the State's theory that the fire had been intentionally set by Way. Instead, according to Posey, a spark from an open circuit breaker ignited flammable vapors present from chemicals used to refinish furniture. This explosion would have been sufficient to hurl a person to the ground.
As to the significance of the photograph of the weight bench, the defense also presented the expert testimony of Dr. Feegel, a medical pathologist, who testified that in his opinion, one of the wounds on the heads of Adrienne and Carol could have occurred when their heads hit a round object, such as the weight extension bar, during an explosion. However, in Dr. Feegel's opinion, it was unlikely that the remaining wound on Adrienne's head or the remaining eleven wounds on Carol's head were caused by mutual combat between the victims.
In response to the defense testimony, the State presented expert testimony explaining that based on all of the physical evidence at the scene, the fire had been intentionally set and gasoline had been used as an accelerant. The State's experts testified that the burn patterns in the garage were inconsistent with an explosion, but consistent with the fire starting when a pile of combustibles had been soaked with gasoline and set using a trail of gasoline. The most intense burns surrounded the bodies, and little combustible materials were close to the bodies. This indicated to the State's experts that the bodies had been doused with gasoline. After the fire, gasoline had accumulated in pools, and tests conducted demonstrated that the gasoline would not have flowed to these areas had it not been intentionally poured.
The trial court denied the Brady claim, finding that the photographs had been disclosed to Way because the arson investigator referenced them in his report and brought the photographs to his deposition prior to trial. The trial court further found that the photographs were not exculpatory and "the suggested alternative theory of the defense is incredible." Specifically, the trial court found that:
The victim of the capital murder suffered two (2) severe, one probably even lethal, blows to her skull. According to the alternative theory these wounds occurred when she was knocked down against a weight-lifting bench by the force of an explosion which occurred when unknown flammable vapors were ignited by some unknown malfunction of the circuit breaker box. Incredibly, according to the alternative theory, this occurred a moment after the victim had inflicted about a dozen severe wounds, identical to her own and again probably even lethal, to the skull of her mother. Then, according to the alternative theory, the force of the explosion caused gasoline to spill on the victim, her mother, a TV set and a box of books and then ignite.
... The opinion of fire expert Eleanor Posey defies logic, is inconsistent with the physical evidence at the fire scene and is refuted by the testimony of on-scene fire investigators and an electrical engineer. The testimony of Petitioner's expert in forensic pathology, Dr. *910 Feegel, merely reiterated expert testimony presented by defense expert Dr. William Gibson during trial. Viewed in the light most favorable to Petitioner, the defense theory that an accidental fire occurred simultaneous with the victim's mutual combat is implausible. No rational juror could have found a reasonable doubt based upon the testimony adduced by Petitioner at the evidentiary hearing.

(Emphasis supplied.) Thus, the trial court concluded that the Brady claim was without merit because there was no reasonable probability of a different outcome had the photographs been used by the defense at trial.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The prosecutor's obligation under Brady extends to the disclosure of evidence that could be used for impeachment, as well as exculpatory evidence. See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "In order to comply with Brady, ... `the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police.'" Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Whether the prosecutor succeeds or fails in meeting this obligation to learn of any favorable evidence known to others acting on the State's behalf in the case, "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." Kyles, 514 U.S. at 438, 115 S.Ct. 1555.
In accordance with Brady, Bagley and Kyles, the United States Supreme Court in Strickler enunciated the three significant elements of a Brady claim as follows:
There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Strickler, 119 S.Ct. at 1948. Accordingly, we review each of these elements.

A. Were the Photographs Favorable to Way?
As to the first prong, the trial court made a statement in its order denying relief because it was "not convinced that the photos were exculpatory," while acknowledging that the photographs could have been used in support of an alternative defense theory. Under Brady, evidence is considered exculpatory merely if it is "favorable to the accused, either because it is exculpatory, or because it is impeaching." Strickler, 119 S.Ct. at 1948.
During the guilt phase of the trial, William Myers, an expert witness called by the State, testified that the fire had not been caused by an electrical shortage. Concerning the circuit breaker, Myers testified that:
Q. Did you make a check in that garage area for any electrical shortages?
A. Yes, sir, I did.
Q. How did you do that?
A. [I] went to the electrical breaker panel that was located on the north wall and checked to see if there had been any indications of localized heat or if any of the breakers had been tripped indicating that there had been a short.
Q. What conclusions did you make?
A. There was no electrical fire in the garage.
Although the expert never affirmatively testified as to whether he had found the *911 breakers tripped, his testimony could lead the jury to conclude that he had examined the circuit breakers and found that they had not been tripped. The photograph of the electrical panel would have shown that the breakers were tripped after the fire. At the very least, it appears that this photograph could have been used to impeach the State's witness as to the condition of the breakers after the fire.
In addition, this photograph could have been used to support the alternative defense theory that the fire had been started accidentally by a spark from an open circuit breaker igniting furniture refinishing chemicals. Likewise, the photograph of the weight bench could have also been used to support this alternative theory that Adrienne's head wounds had not been caused by Way. Thus, we conclude that the photographs were exculpatory evidence under Brady and Bagley.

B. Were the Photographs Suppressed?
Way's resentencing counsel testified at the evidentiary hearing that the photographs were first found by the defense when preparing for the resentencing proceedings. Resentencing counsel testified that he asked Michael Benito, who was the trial prosecutor in this case, if that was "all the evidence." In response, Benito showed resentencing counsel a box full of photographs that had been in Benito's desk rather than with the rest of the file. Resentencing counsel further testified that Benito stated the box was full of photographs that "essentially we never used, we never showed to anybody. If you want them take a look at them." The photographs at issue were in that box.
Benito testified he did not recall whether this conversation occurred or when these specific photographs had been disclosed to the defense. However, Benito testified that at all times he had maintained an "open file" policy.
The trial court found that "trial counsel did not have possession of the disputed photos at trial." The trial court further found that the photographs were part of the file of an expert witness, Henry Regalado, who testified at trial on behalf of the State and who also gave a deposition prior to trial. In finding that the photographs had been "disclosed," even though trial counsel did not have possession of the photographs, the trial court relied on the expert witness's testimony that he had brought the photographs to the deposition and his report that stated that "photographs were also taken by Mr. Regalado, some of which are included in this report, with the remainder being on file" at Regalado's office. There was no testimony at the evidentiary hearing as to whether the defense knew of the presence of the photographs at the deposition. However, the trial court found, "This report was provided to trial counsel and was used by him during his deposition of Mr. Regalado. Mr. Regalado had the photos with him at the deposition, available for viewing and/or copying."
A trial court's finding after evaluating conflicting evidence that Brady material had been disclosed is a factual finding. See United States v. Willis, 759 F.2d 1486 (11th Cir.1985); Squires v. Dugger, 794 F.Supp. 1568 (M.D.Fla.1992). As a factual finding, the reviewing court should uphold the finding as long as it is supported by competent, substantial evidence in the record. See Stephens v. State, 748 So.2d 1028 (Fla.1999).
In previous cases, this Court has broadly stated that evidence was not "suppressed" where it was equally available to the State and the defense. See Roberts v. State, 568 So.2d 1255, 1260 (Fla.1990); James v. State, 453 So.2d 786, 790 (Fla. 1984). However, in those cases, the defendant was aware of the exculpatory information. See Roberts, 568 So.2d at 1260 (defendant aware of evidence that would show he was under the influence of drugs or alcohol during the crime); James, 453 So.2d at 790 (defendant was aware of existence of photographs contained in confidential juvenile records). This case is also *912 unlike Provenzano v. State, 616 So.2d 428 (Fla.1993), where the defendant claimed that the State had suppressed the notes taken by the State's expert witness. The Court found that these notes had not been suppressed because the expert used the notes while testifying at trial, and the defendant could have obtained them at that time. See id. Thus, the defendant in Provenzano should have been actually aware of the expert's notes.
However, in this case, there is no evidence that the expert witness referred to the disputed photographs during his deposition or his trial testimony. Indeed, none of Regalado's deposition or trial testimony discussed the electrical panel. Further, and most significantly, at a pretrial hearing occurring after Regalado's deposition, the prosecutor affirmatively assured the defense that all photographs of the crime scene had already been produced.[11] In light of these representations, the State may have unintentionally caused the defense lawyer to assume that all of the photographs of the crime scene had been produced, including those in the expert witness's report. Cf. Bagley, 473 U.S. at 683, 105 S.Ct. 3375 (finding that prosecutor's response to discovery request may have "misleadingly induced" defense counsel to believe that impeachment evidence did not exist). Therefore, as a matter of law, we find that a finding of disclosure would be inconsistent with Brady where, as here, the State affirmatively represented that all the photographs of the crime scene had been produced.
As to the issue of whether trial counsel should have been aware of the photographs because all photographs were referenced generally in the report, in Young v. State, 739 So.2d 553 (Fla.1999), this Court observed that under the rules of discovery
there is an obligation upon the defendant to exercise due diligence pretrial to obtain information. However, we have also recognized ... that the focus in postconviction Brady-Bagley analysis is ultimately the nature and weight of undisclosed information. The ultimate test in backward-looking postconviction analysis is whether information which the State possessed and did not reveal to the defendant and which information was thereby unavailable to the defendant for trial, is of such a nature and weight that confidence in the outcome of the trial is undermined to the extent that there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different.

Id. at 559 (emphasis supplied). Thus, while the discovery rules impose an obligation upon defendants to obtain exculpatory materials through the exercise of due diligence, the "ultimate test" in determining if a Brady violation occurred is whether "confidence in the outcome of the trial is undermined to the extent that there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different." Id.

C. Prejudice
As explained by the United States Supreme Court in Kyles, a "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more." Kyles, 514 U.S. at 437, 115 S.Ct. 1555; see Strickler, 119 S.Ct. at 1948; Bagley, 473 U.S. at 675, 105 S.Ct. 3375. In addition, the defendant must establish *913 that the defense was prejudiced by the State's suppression of evidence, in other words, that the evidence was material. See Strickler, 119 S.Ct. at 1948-49. The United States Supreme Court articulated the specific test for determining the materiality of evidence in order to meet the prejudice prong of Brady:
[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

Bagley, 473 U.S. at 682, 105 S.Ct. 3375 (plurality opinion) (emphasis supplied); see Strickler, 119 S.Ct. at 1952.
A showing of materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal." Kyles, 514 U.S. at 434, 115 S.Ct. 1555. As the United States Supreme Court recently explained:
[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."
Strickler, 119 S.Ct. at 1952 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555) (emphasis supplied) (citations omitted).[12] The cumulative effect of the suppressed evidence must be considered when determining materiality. See Kyles, 514 U.S. at 436 & n. 10, 115 S.Ct. 1555. "It is the net effect of the evidence that must be assessed." Jones v. State, 709 So.2d 512, 521 (Fla. 1998); see Kyles, 514 U.S. at 436 & n. 10, 115 S.Ct. 1555.
Although reviewing courts must give deference to the trial court's findings of historical fact, the ultimate question of whether evidence was material resulting in a due process violation is a mixed question of law and fact subject to independent appellate review. See Hays v. Alabama, 85 F.3d 1492, 1498 (11th Cir.1996), cert. denied, 520 U.S. 1123, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997); Kennedy v. Herring, 54 F.3d 678 (11th Cir.1995); see also Stephens v. State, 748 So.2d 1028 (Fla.1999) (concluding that appellate courts should defer to the findings of historical fact with regard to a claim of ineffectiveness of trial counsel but that the ultimate question of ineffectiveness is a mixed question of law and fact subject to independent appellate review). In its order denying relief, the trial court concluded that:
[T]he overwhelming circumstantial evidence admitted at trial supports the conclusion that no reasonable probability exists that possession of the photographs by Petitioner prior to trial would have resulted in a different outcome. These photographs and the expert opinions drawn therefrom are not of such a nature that they would probably produce an acquittal on retrial. The opinion of fire expert Eleanor Posey defies logic, is inconsistent with the physical evidence at the fire scene and is refuted by the testimony of on-scene fire investigators and an electrical engineer. The testimony of Petitioner's expert in forensic pathology, Dr. Feegel, merely reiterated expert testimony presented by defense expert Dr. William Gibson during trial. Viewed in the light most favorable to Petitioner, the defense theory that an accidental fire occurred simultaneous[ly] with the victim's mutual combat is implausible. No rational juror could have found a reasonable doubt based upon the testimony adduced *914 by Petitioner at the evidentiary hearing.

(Emphasis supplied.)
Way asserts that the trial court applied the wrong legal standard when it stated that the photographs were not material because "they are not of such a nature that they would probably produce an acquittal on retrial." Way is correct that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Instead, the proper inquiry is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435, 115 S.Ct. 1555.
Although the trial court in this case may have used an incorrect standard when it tied the materiality inquiry to whether the photographs would result in an acquittal on retrial, it is clear from the entire order that the trial court was in fact assessing whether confidence in the verdict was undermined under the Kyles standard and was not utilizing a sufficiency of the evidence test. Significantly, the trial court's order assesses the credibility of the defense expert witnesses and the impact their testimony would have had if presented during trial in light of the evidence presented at the evidentiary hearing, the trial, and the resentencing proceeding.
In evaluating the impact this evidence had on the reliability of the trial, the trial court found that the testimony of defense expert Posey as to the source of the fire was contrary to the physical evidence at the scene and refuted by the testimony of the State's expert witnesses. The trial court concluded that the alternative defense theory was so implausible that "[n]o rational juror could have found a reasonable doubt based upon the testimony adduced by Petitioner at the evidentiary hearing." The trial court's finding that Way's alternative theory is rebutted by the State's expert witnesses and contrary to the physical evidence at the scene of the crime is supported by competent, substantial evidence based on the evidence presented at the evidentiary hearing and at trial.
The real problem with the alternative defense theory is that it is not only substantially contradicted by the physical evidence, but it also fails to explain the majority of the victims' head wounds. Carol suffered multiple blunt traumas to her head and Adrienne suffered two severe head wounds. In fact, one of the lacerations suffered by Adrienne was so severe that it cracked her skull and went into the brain tissue. According to Posey, the force of the explosion would have been sufficient to hurl a person to the ground. However, as Posey acknowledged, the explosion could only account for one head injury per victim, leaving eleven significant wounds on Carol and one significant wound on Adrienne unexplained. In defense expert Dr. Feegel's opinion, it is unlikely that the remaining injuries were caused by mutual combat. The State's expert pathologist, Dr. Diggs, had testified at trial that the similarity between the wounds on the two victims' heads made it much more likely that the victims had been injured by a third party rather than through mutual combat.[13] Further, according to Dr. Diggs, the severity of the wounds would make it difficult for the victims to continue battering each other. Each individual wound would have caused severe dizziness, and the wound that cracked Adrienne's skull would have rendered her unconscious immediately. Also unexplained by the defense theory is that the blood splatter evidence entered at trial *915 showed that both women received many of the wounds while in a low-lying position.
Before accepting this alternative defense theory, a juror would have had to accept that after being called out to the garage, Adrienne and her mother severely bludgeoned each other, and that thereafter, coincidentally and accidentally an electrical spark from an open circuit breaker started a fire. We agree with the trial court that this is contrary to the physical evidence at trial and defies logic when considered in totality with all the evidence presented at trial, the resentencing and the evidentiary hearing.
Thus, we agree with the conclusion of the trial court that even if these photographs had been disclosed by the State, Way has not demonstrated that he was prejudiced thereby pursuant to the Brady, Kyles, and Strickler standard. Under these cases, Way must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," Strickler, 119 S.Ct. at 1952 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555), had the defense been able to use the photographs at trial. We affirm the denial of postconviction relief by the trial court because the photographic evidence does not put this case in such a different light as to undermine confidence in the verdict.[14]
Way further asserts that the cumulative effect of this evidence should be considered in conjunction with the previous claims raised on direct appeal and during his first motion for postconviction relief. However, Way's written closing arguments following the evidentiary hearing, which purported to inform the trial court of the correct legal standard to apply to the Brady claim, did not assert that the materiality of the photographs should be considered in conjunction with any other previous claims. Thus, we find that the claim that the cumulative impact should have been considered when determining materiality has not been preserved for review because it was not raised in the trial court. However, even if we were to engage in a cumulative analysis, we do not find that our conclusion as to prejudice would change. Cf. Lightbourne v. State, 742 So.2d 238, 249 (Fla.1999).
We also reject Way's related claim that the trial court erred in limiting the testimony of Way's son, Fred Way, Jr., and excluding the testimony of Betty Slanton and Sean Rooker. The trial court allowed Fred Way, Jr., to testify that the weight bench in the garage had been in working order before the fire and that his mother stored furniture refinishing chemicals in the garage. The defense also proffered testimony that Fred Way, Jr., would testify that he recanted his trial testimony that he had seen his father throw a hammer over the backyard fence after the fire.[15] The trial court sustained the State's objection to this testimony as beyond the scope of the remand for the evidentiary hearing on the Brady claim.
In addition, the trial court sustained the State's objection to the testimony of Sean Rooker. An eyewitness to the fire, Rooker initially told police that he had observed *916 Adrienne and Carol having an argument prior to the trial. Rooker later told police that this statement was a lie. At the evidentiary hearing, collateral counsel proffered the testimony of Rooker that he had never told the police that he lied when he said that he had heard Adrienne and Carol arguing prior to the fire. The trial court sustained the State's objection to this testimony because it was unrelated to the issue of whether the photographs had been withheld from the defense.
In addition, the trial court sustained the State's objection to the testimony of Betty Slanton, who collateral counsel claimed was a newly discovered witness who would testify that at the time of the fire Way was visibly upset. The trial court ruled that this evidence was also irrelevant to the Brady claim, because this testimony would have been used by the defense to rebut the State's evidence that Way was unnaturally calm and unemotional at the scene of the fire regardless of whether the defense had access to the photographs.
We find that the trial court did not abuse its discretion in concluding that the testimony of these witnesses was beyond the scope of the remand to determine whether a Brady violation occurred. See Mendyk v. State, 707 So.2d 320 (Fla.1997). Further, Way never attempted to amend his postconviction motion to include additional claims that the testimony of these three witnesses constituted newly discovered evidence and he does not make that claim on appeal. For these reasons, we affirm the trial court's denial of relief on Way's postconviction motion.

APPEAL FROM RESENTENCING
We next turn to the issues Way raised on appeal from his resentencing proceeding. For the reasons expressed below, we affirm the trial court's imposition of the death penalty in this case.

A. Admissibility of Evidence Questioning Way's Guilt of Arson
During the resentencing proceedings, Way proffered the testimony of Dr. Feegel, who would have testified that the victims' injuries could have occurred during a propane gas explosion, and were inconsistent with gasoline being poured on their bodies.[16] In addition, Way proffered the testimony of Craig Tanner, an arson investigator, who would have testified that the circuit breaker malfunctioned causing an electrical spark to light fumes from a nearby propane gas tank. The trial court excluded this testimony on the grounds that it was only relevant to Way's guilt of the crimes underlying his convictions for murder and arson and was not relevant to any resentencing issues. The trial court also limited Way's cross-examination of the State's witness Detective Croll regarding what was done during the arson investigation.
As the State argues, this Court has previously rejected the argument that evidence that would serve only to create a lingering doubt of the defendant's guilt is admissible as a nonstatutory mitigating circumstance. See, e.g., Preston v. State, 607 So.2d 404, 411 (Fla.1992); King v. State, 514 So.2d 354, 358 (Fla.1987). Although the Eighth Amendment of the United States Constitution requires that the jury or court imposing the death sentence not be precluded from considering "any aspect of a defendant's character or record and any of the circumstances of the offense," Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), we have previously rejected the argument that evidence relevant only to establish a lingering doubt of the defendant's guilt is a mitigating circumstance that the Eighth Amendment requires the fact-finder to consider. See King v. Dugger, 555 So.2d 355, 358 (Fla.1990); White *917 v. Dugger, 523 So.2d 140, 140 (Fla.1988); see also Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (finding that Eighth Amendment does not require that sentencing jury be instructed that it can consider lingering doubt of guilt as a mitigating factor).
However, Way argues that this evidence was admissible, not as a nonstatutory mitigating circumstance, but in order to rebut the evidence introduced by the State concerning the applicability of aggravating circumstances. As Way asserts, a resentencing is a completely new proceeding, and the resentencing judge is not obligated to find the same aggravating and mitigating circumstances that were established in the original sentencing proceeding. See Preston v. State, 607 So.2d 404 (Fla.1992); Teffeteller v. State, 495 So.2d 744, 745 (Fla.1986). This Court has explained that
it is within the sound discretion of the trial court during resentencing proceedings to allow the jury to hear or see probative evidence which will aid it in understanding the facts of the case in order that it may render an appropriate advisory sentence. We cannot expect jurors impaneled for capital sentencing proceedings to make wise and reasonable decisions in a vacuum.
Teffeteller, 495 So.2d at 745.
While the State is not allowed to relitigate guilt during resentencing proceedings, it may introduce evidence concerning the facts and circumstances of the crime in order to prove the aggravating circumstances beyond a reasonable doubt. See Valle v. State, 581 So.2d 40, 45 (Fla. 1991). Similarly, a defendant has a right to present evidence that is relevant to the nature and circumstances of the crime. See Downs v. State, 572 So.2d 895, 899 (Fla.1990). An example of a relevant circumstance of the crime is that the defendant played a relatively minor role in the murder compared to the other participants. See id. Of course, the defendant can also introduce evidence that is relevant to any of the statutory aggravating circumstances the State seeks to establish or to any statutory or nonstatutory mitigation. Fundamental fairness and due process require this.
However, we have rejected claims that the trial court abused its discretion in precluding the admission of evidence that was only relevant to rebut the defendant's guilt of the underlying crime. See Waterhouse v. State, 596 So.2d 1008, 1015 (Fla. 1992); King, 514 So.2d at 358. While the defendant in Waterhouse was allowed to present evidence to rebut the State's evidence in support of the aggravating circumstance that a sexual battery occurred during the commission of the capital murder, the defendant had not been previously convicted of sexual battery. See Waterhouse, 596 So.2d at 1015. Although Way relies upon Waterhouse, in that case we found the trial court "appropriately precluded Waterhouse from presenting evidence questioning his guilt." 596 So.2d at 1015. In this case, Way had previously been convicted of both arson and first-degree murder. Thus, the trial court did not abuse its discretion in excluding testimony that was only relevant to question the validity of the underlying arson conviction. If Way had been able to put on the testimony of the expert witness to explain the alternate theory of the crime, as set forth in his Brady claim, he would have been relitigating the question of guilt rather than explaining the circumstances of the crime.
Second, as for Way's related claim that the trial court erred in limiting his cross-examination of Detective Croll, it appears that the trial court did not abuse its discretion. Way is correct in his assertion that the confrontation clause applies to sentencing proceedings. See, e.g., Engle v. State, 438 So.2d 803, 814 (Fla.1983). However, the cases relied upon by Way to establish that it is reversible error to limit cross-examination on a critical fact supporting guilt are distinguishable because *918 they involved testimony admitted during the guilt phase. See, e.g., Zerquera v. State, 549 So.2d 189, 192 (Fla.1989).
In this case, during resentencing the testifying arson investigator gave relatively short testimony describing the facts that both victims were burned in a fire in the garage, and that an arson investigation was conducted in which the investigators determined that the fire was intentionally set using gasoline as an accelerant. The trial court ruled that Way could cross-examine the detective or call other detectives in rebuttal to establish that the investigators had not in fact determined that the fire had been intentionally set. Thus, the trial court afforded Way considerable leeway. However, the trial court ruled that Way could not question Detective Croll concerning whether the investigation had been adequately conducted because the trial court found that the issue of the adequacy of the investigation was collateral and had already been decided adversely to Way when he was convicted of arson. This type of testimony would not have assisted the resentencing jury in evaluating the nature and circumstances of the crime. Because the State in this case took care to limit the testimony about the circumstances of the crime, we find no abuse of discretion in the trial court's restriction of cross-examination in this case. We find that the limitation of the detective's cross-examination did not result in a violation of the confrontation clause or otherwise violate Way's due process rights.

B. Applicability of Aggravating Circumstances
Way challenges the trial court's findings that: (1) the murder in this case occurred during the commission of an arson; (2) Way was previously convicted of a violent felony, based only on the contemporaneous murder of his wife; (3) the murder was cold, calculated, and premeditated (CCP); and (4) the murder was heinous, atrocious, and cruel (HAC). As we have previously stated,
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla. 1997) (footnote omitted). We find that competent substantial evidence in the record supports the trial court's findings as to these aggravating circumstances.
First, Way challenges the trial court's finding that the murder in this case occurred during the commission of an arson. As discussed above, the trial court did not improperly limit Way from introducing evidence to rebut this aggravating circumstance. On essentially the same evidence, we upheld the trial court's finding of the applicability of this aggravating circumstance during the direct appeal:
Appellant next argues that the trial court erroneously found that the capital murder was committed while he was engaged in the crime of arson. In support, appellant avers to the fact that it could not be determined whether the victims died from the blunt trauma wounds or the fire, and that the blows were delivered prior to the fire. We agree with the state that the other committed felony, arson, need not be the cause of death to support this aggravating circumstance. Rather, it is sufficient that the capital murder occur during the same criminal episode as the enumerated felony, which was certainly the case in this instance. Accord Adams v. State, 412 So.2d 850, 854-55 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982) (cause of death was strangulation which occurred during the criminal episode of kidnapping and attempted rape); Scott v. State, 411 So.2d 866, 867 (Fla.1982) *919 (cause of death was head injuries which occurred during the criminal episode of robbery and/or burglary).
Way I, 496 So.2d at 128. We likewise find that the record during the resentencing proceeding supports the trial court's finding that this aggravating circumstance applies.
Second, Way's conviction for the contemporaneous murder of Carol Way established the applicability of the aggravating circumstance that Way had previously been convicted of a felony involving the use of violence. See, e.g., Pooler v. State, 704 So.2d 1375, 1379 (Fla.1997); Mahn v. State, 714 So.2d 391, 399-400 (Fla.1998).
Third, we find that the record supports the imposition of the aggravating circumstance that the murder was HAC. The trial court found that:
The medical examiner, Dr. Charles Diggs, testified that Adrienne Way died from blunt trauma to the head and/or 100% total body burns. He further testified that she was alive at the time of the fire and that she could have moved in response to the fire after having suffered the blows to her head. A witness, Randall Hierlmeier, testified that when he came upon the scene, the Defendant was standing outside the burning garage, squirting a hose in the direction of a car parked in the garage. He testified that Defendant was making no attempts to enter the garage and was unresponsive to questions regarding who, if anyone, was in the garage. The witness heard screams coming from the garage and testified he saw someone engulfed in flames in the garage struggling to move. The brutal beating and burning of Adrienne Way, the daughter of the Defendant, sets this crime apart from the norm of capital felonies.
Way argues that the evidence does not establish that this crime was HAC because the State failed to prove that Way intended to torture the victim or that the crime was meant to be especially painful. However, this Court has upheld the HAC aggravator in similar cases where the defendant bludgeoned and then burned a victim who was alive. See Willacy, 696 So.2d at 696 (victim beaten, strangled, and burned); Henry v. State, 613 So.2d 429, 433-34 (Fla.1992) (defendant incapacitated victims and then set them on fire); see also Lawrence v. State, 698 So.2d 1219, 1222 (Fla.1997) ("We have consistently upheld HAC in beating deaths."); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986) (victim bludgeoned with a hammer and then shot). We agree with Way that the evidence must show that the victim was conscious and aware of her impending death to support this aggravating circumstance. See Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998), cert. denied, 525 U.S. 1126, 119 S.Ct. 911, 142 L.Ed.2d 909 (1999); Jackson v. State, 451 So.2d 458, 463 (Fla.1984); Simmons v. State, 419 So.2d 316, 318-19 (Fla.1982). For example, in Simmons the defendant bludgeoned the victim with a sharp tool and then attempted to conceal the murder by burning the body. See Simmons, 419 So.2d at 317. This Court found in Simmons that the evidence did not support the finding of HAC because the victim was not aware he was going to be hit with the tool, which caused an instantaneous death. See id. at 319-18.
However, unlike in Simmons, the evidence in this case supports a conclusion that Adrienne was aware of her impending death because she screamed her sister's nickname shortly after entering the garage. Further, she was alive during the fire because a witness heard her screaming and saw her struggling to move while engulfed in flames. Although Way argues that there was no evidence he intended to set his daughter on fire, the evidence shows that he obstructed efforts to extinguish the fire despite the fact that his daughter was screaming and engulfed in flames.
While the Court's resolution of this issue during Way's original direct appeal is not dispositive because the finding of a mitigating *920 or aggravating circumstance is not an "ultimate fact" that is binding during the resentencing proceeding, see Preston, 607 So.2d at 407-09, we previously rejected Way's very similar argument upon essentially the same evidence.[17] We again find that competent, substantial evidence supports the trial court's finding that the HAC aggravating circumstance applies.
Fourth, we reject Way's claim that the record does not support the trial court's finding that the murder in this case was CCP. On very similar evidence during the original direct appeal, we found that the evidence supported the imposition of this aggravating circumstance. See Way I, 496 So.2d at 129. Further, during the resentencing, although the sentencing order stated that the record supported a finding that the murder was CCP, the order also stated that the trial court had not relied upon this aggravating circumstance because the State had not asserted its applicability during the resentencing proceedings. Because the jury had not been instructed on this aggravating circumstance and the trial court stated it did not consider this aggravating circumstance, even if the record does not support the imposition of this aggravating circumstance, we conclude that any error in the trial court's finding this aggravating circumstance applicable is harmless beyond a reasonable doubt. See Sochor v. State, 619 So.2d 285, 293 (Fla.1993) (affirming death sentence despite the trial court's error in finding the aggravating circumstance of CCP applicable because "if there is no likelihood of a different sentence, the error must be deemed harmless"); cf. Sims v. State, 681 So.2d 1112, 1118 (Fla.1996) (concluding that the trial court did not err in finding applicable an aggravating circumstance that had not been alleged by the State and for which the jury had received no instruction).

D. Proportionality
Finally, we consider Way's claim that the imposition of the death penalty is disproportionate. In aggravation, the trial court considered that: (1) Way was previously convicted of a felony involving the use or threat of violence (Carol Way's murder); (2) the capital felony was committed while Way was engaged in the commission of arson; and (3) the murder was HAC. The trial court also found the murder was CCP, but did not rely upon that finding. The trial court considered the following statutory mitigating circumstances: (1) Way had no significant history of prior criminal activity; (2) Way's age at the time of the crime (thirty-eight). The court also considered the following nonstatutory mitigation: (1) difficult childhood father died at an early age, family was poor; (2) four years of service in the Air Force and twelve years of service in the air force reserves; (3) successful employment history; (4) reputation for peacefulness and hard work; (5) a hearing impairment and possibly a mental impairment; (6) good behavior in prison; (7) all other mitigating circumstances asserted by the defendant.
*921 This Court recently rejected an argument that a death sentence of a defendant who killed his wife and two children was disproportionate because the murder arose from a domestic dispute. See Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998).
[T]his Court has never approved a "domestic dispute" exception to imposition of the death penalty. See [Santos v. State, 629 So.2d 838 (Fla.1994)] (finding death sentence disproportionate because four mitigating circumstances of extreme emotional disturbance, substantial inability to conform conduct to requirements of law, no prior history of criminal conduct, and abusive childhood outweighed single aggravating circumstance of prior violent felonies based upon crimes that occurred during the murders). In some murders that result from domestic disputes, we have determined that CCP was erroneously found because the heated passions involved were antithetical to "cold" deliberation. Santos v. State, 591 So.2d 160, 162 (Fla. 1991); Douglas v. State, 575 So.2d 165, 167 (Fla.1991). However, we have only reversed the death penalty if the striking of the CCP aggravator results in the death sentence being disproportionate.
Zakrzewski, 717 So.2d at 493 (quoting Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996)) (alterations in original); see also Porter v. State, 564 So.2d 1060, 1064-65 (Fla.1990) (finding death sentence to be proportionate where defendant committed "a cold-blooded, premeditated double murder" of his "live-in lover" and her new boyfriend); Brown v. State, 565 So.2d 304, 309 (Fla.1990) (finding death sentence to be proportionate where defendant murdered his girlfriend's child), abrogated on other grounds, Jackson v. State, 648 So.2d 85, 88 (Fla.1994).
This case is similar to Zakrzewski, where the defendant killed his wife through blunt and sharp trauma, and then killed his two children with a machete. In that case, the trial court found applicable the aggravating circumstances of (1) HAC, (2) the convictions for the contemporaneous murders, and (3) CCP for the murders of the children, but this circumstance was not applicable for the murder of the wife. See Zakrzewski, 717 So.2d at 491. Similar to Way, Zakrzewski: (1) had no significant criminal history prior to the murders; (2) served in the military; (3) was a hard worker and well thought of by others; and (4) had an emotional response to the deaths. See id.
However, in Zakrzewski, the additional statutory mitigator of extreme mental or emotional disturbance was applicable. See id. at 493-94. As this Court pointed out in Spencer, in many of the domestic dispute cases where the death penalty was found to be disproportionate, substantial mental mitigation is present. 691 So.2d at 1065 (citing Santos, 591 So.2d at 162, and Lemon v. State, 456 So.2d 885, 887-88 (Fla. 1984)); see also Ross v. State, 474 So.2d 1170, 1174 (Fla.1985) (finding death penalty disproportionate though HAC applied where defendant murdered wife in angry domestic dispute, was under extreme emotional distress, was intoxicated, and had no prior history of violence). In contrast to these cases, there was not significant mental mitigation presented in this case, although the trial court found Way "possibly had a mental impairment." We conclude that the death penalty is a proportionate penalty in this case.

CONCLUSION
We find that the remainder of Way's claims have been previously decided adversely to him.[18] For the reasons expressed above, we affirm the imposition of *922 the death penalty and the denial of postconviction relief.
It is so ordered.
HARDING, C.J., and SHAW and ANSTEAD, JJ., concur.
WELLS, J., concurs with an opinion.
PARIENTE, J., concurs with an opinion, in which ANSTEAD, J., concurs.
LEWIS, J., concurs in result only.
QUINCE, J., recused.
WELLS, J., concurring.
I concur in the affirmance of the trial court's orders. I concur in result only as to the majority's Brady[19] claim analysis. I find that the Brady claim analysis is unnecessarily complicated and that it omits the second part of the analysis, which has four components, not three. This requires a showing of due diligence by the defendant. A four-part analysis is consistent with this Court's precedent in Robinson v. State, 707 So.2d 688, 693 (Fla.1998), and Hegwood v. State, 575 So.2d 170 (Fla. 1991), and the analysis of the Eleventh Circuit in Wright v. Hopper, 169 F.3d 695, 701 (11th Cir.1999), and Sims v. Singletary, 155 F.3d 1297, 1310 (11th Cir.1998). Wright and Sims are post-Kyles v. Whitley decisions.
Further, I am concerned that the majority's Brady analysis in stating what are factual questions to which deference is owed to the trial court and what are questions of mixed law and fact subject to de novo review reaches too far, and claims de novo review of issues which are actually questions of inferences drawn from facts. An example of this is the discussion on page 16 in respect to the "finding of disclosures." I believe reviewing courts must avoid complex analysis which constructs a basis upon which to label something a mixed question of law and fact in order to afford a premise upon which to then exercise appellate court judgment in place of the judgment which has been made by the trial court. It is vital that we respect the time-honored discretion of trial courts and not remake decisions which, because of the trial court's superior vantage point, should be within the purview of the trial court and are presumed correct.
PARIENTE, J., concurring.
I concur in the denial of the Brady claim and the affirmance of the death sentence. I write separately to address Way's point on appeal that this Court should recede from its prior decisions that preclude the consideration of "lingering" or "residual" doubt as a nonstatutory mitigatorespecially because this was a resentencing proceeding in which the jury did not decide the issue of guilt.
Many of the concerns over the death penalty have focused on the possibility of executing an innocent persona spectre that runs contrary to the interests of justice. Although the United States Supreme Court has rejected the argument that the Eighth Amendment requires that a capital sentencing jury be instructed that it can consider lingering doubt evidence in mitigation, see Franklin v. Lynaugh, 487 U.S. 164, 173-74, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), in view of the finality of the death penalty, there are some important reasons why our responsibility to independently review death sentences might extend to an evaluation of the evidence supporting guilt.
As then-Justice Barkett noted in her specially concurring opinion in Melendez v. State, 498 So.2d 1258, 1262 (Fla.1986),
While a jury verdict of guilt based on competent substantial evidence is sufficient for upholding convictions and prison sentences, I do not believe it is always enough for upholding a death sentence. There are cases, albeit not many, when a review of the evidence in the record leaves one with the fear that *923 an execution would perhaps be terminating the life of an innocent person.
Earlier, Justice Thurgood Marshall made similar observations:

There is certainly nothing irrational indeed, there is nothing novelabout the idea of mitigating a death sentence because of lingering doubts as to guilt. It has often been noted that one of the most fearful aspects of the death penalty is its finality. There is simply no possibility of correcting a mistake. The horror of sending an innocent defendant to death is thus qualitatively different from the horror of falsely imprisoning that defendant. The belief that such an ultimate and final penalty is inappropriate where there are doubts as to guilt, even if they do not rise to the level necessary for acquittal, is a feeling that stems from common sense and fundamental notions of justice. As such it has been raised as a valid basis for mitigation by a variety of authorities.
Heiney v. Florida, 469 U.S. 920, 921-22, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984) (dissenting from denial of certiorari) (emphasis supplied).
Addressing concerns such as these, the drafters of the Model Penal Code included the consideration of lingering doubts of guilt in their model death penalty statute as not just a mitigating factor, but as a factor that excludes the possibility of a death sentence as a matter of law:
Death Sentence Excluded. When a defendant is found guilty of murder, the Court shall impose sentence for a felony of the first degree [i.e., a non-capital offense] if it is satisfied that:
. . . .
(f) although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt.
Model Penal Code § 210.6(1) (1962).
The fact that a jury or judge may not decide to impose the death penalty because of concerns over the defendant's guilt is a reality acknowledged by the Eleventh Circuit Court of Appeals in Smith v. Wainwright, 741 F.2d 1248 (11th Cir.1984).[20] In the course of deciding whether trial counsel was ineffective for failing to impeach the State's key witnesses with prior inconsistent statements, the Eleventh Circuit observed that the failure of counsel to use the statements not only may have affected the outcome of the guilt phase of the trial, but may have also changed the outcome of the penalty phase of the trial. See id. at 1255. The Eleventh Circuit reasoned that the outcome of the penalty phase may have been affected because "jurors may well vote against the imposition of the death penalty due to the existence of `whimsical doubt.'" Id.
Because a lingering doubt of the defendant's guilt appears to be an actual factor that sentencing phase juries and judges consider when making the sentencing recommendation, I conclude that the introduction of this type of evidence is especially important during resentencing proceedings. In resentencing proceedings, the jurors do not have the benefit of hearing evidence presented in the guilt phase that might have cast a doubt on the defendant's guilt.
A good example of why it is important to allow the presentation of lingering doubt evidence during resentencing proceedings is set forth in Justice Barkett's dissenting opinion in King v. State, 514 So.2d 354 (Fla.1987). In King's case, the Eleventh Circuit had previously found that defense *924 counsel was constitutionally ineffective because
[the defendant] was convicted on circumstantial evidence which however strong leaves room for doubt that a skilled attorney might raise to a sufficient level that, though not enough to defeat conviction, might convince a jury and a court that the ultimate penalty should not be exacted, lest a mistake may have been made.

See id. at 361 (quoting King v. Strickland, 748 F.2d 1462, 1464 (11th Cir.1984)) (emphasis supplied). Justice Barkett observed that the defendant should not lose the benefit of this lingering doubt argument during the resentencing proceeding. See id. Accordingly, Justice Barkett concluded that the defendant should have been allowed to present evidence during the resentencing proceeding that would place a lingering doubt of the defendant's guilt in the jurors' minds. See id.
The protection of allowing the consideration of lingering doubt evidence is even more important where the death penalty may be imposed by a vote of seven to five, a bare majority of the jurors, as occurred in this case. In fact, Florida is in a small minority of jurisdictions with a statute that allows the imposition of the death penalty even though the jurors' vote is less than unanimous.[21]
In summary, I believe that the nature and strength of the evidence of guilt should be considered in deciding whether to impose the death sentence and in whether to uphold a death sentence. I urge the Legislature consider including evidence of residual doubt as a statutory mitigating factor that could be considered by juries in making a sentencing recommendation, the trial court in imposing the death sentence, and this Court in determining whether the death penalty should be affirmed. Alternatively, I urge the Legislature consider requiring a unanimous jury verdict, or at the minimum a vote of ten-to-two, for a jury recommendation of death.
My view of this issue, however, does not alter my conclusion regarding the propriety of the imposition of the death penalty in the present case. Indeed, after careful review of the record, I believe that the evidence of guilt rises to the level of certainty that supports the imposition of the death penalty.
ANSTEAD, J., concurs.
NOTES
[1] In Way v. Dugger, 568 So.2d 1263 (Fla. 1990) (Way II), we rejected Way's claim that the testimony of the surviving daughter, Tiffany, was unreliable because it was induced by hypnosis and that trial counsel was ineffective in failing to move to exclude it. We first noted that subsequent to the trial in Way, we held in Bundy v. State, 471 So.2d 9 (Fla. 1985), that hypnotically induced testimony is now per se inadmissible in the courts of Florida but that a hypnotized witness can "testify to all events other than the new matter discovered at the hypnotic session." Id. at 19. We determined that because Bundy had not been decided at the time of Way's trial, counsel was not ineffective for failing to exclude Tiffany's testimony. See Way II, 568 So.2d at 1265. In addition, we held that "the record does not demonstrate that Tiffany Way's testimony at trial was induced or refreshed by hypnosis." Id.
[2] Adrienne's body was found in the location described by the witness.
[3] A death warrant was signed in 1988 and the trial court granted a stay of execution in order to hold an evidentiary hearing on the motion for postconviction relief. See Way II, 568 So.2d at 1264 n. 1.
[4] In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality), the United States Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 604, 98 S.Ct. 2954 (footnote omitted); see also Skipper v. South Carolina, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In reaching this conclusion in Lockett, the Court reasoned that "[g]iven that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases." 438 U.S. at 605, 98 S.Ct. 2954. In its later decision in Hitchcock v. Dugger, 481 U.S. 393, 399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), the United States Supreme Court vacated the death penalty of a Florida defendant where the State did not establish the harmlessness of the error occurring when the defendant's advisory jury was instructed not to consider nonstatutory mitigation and the trial judge did not consider nonstatutory mitigation.
[5] (1) Way was previously convicted of a felony involving the use of threat or violencethe second-degree murder conviction for the murder of his wife Carol; (2) the murder was committed while Way was engaged in the commission of arson; and (3) the murder was heinous, atrocious, and cruel (HAC). The trial court also stated that the record supported a finding that the murder was cold, calculated and premeditated (CCP), but specifically did not rely upon that finding because the State did not allege during the penalty phase proceeding that the CCP aggravator was applicable.
[6] (1) Way had no significant history of prior criminal activity; (2) Way's age at the time of the crime38.
[7] (1) Way's childhood-his father died when Way was eleven years old and Way's family was poor and he worked at an early age to help his family; (2) Way's service in the Air Force and Air Force Reserves; (3) Way's successful employment with the Federal Aviation Administration; (4) Way's friends and relatives testified that he enjoyed a reputation for peacefulness and hard work; (5) Way suffered from a hearing impairment and possibly a mental impairment; (6)Way behaved well in prison, having received no disciplinary reports during the past eight years of incarceration.
[8] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[9] Way's claims are: (1) the trial court erred in denying Way's Brady claim; (2) the trial court improperly limited the testimony presented at the evidentiary hearing; and (3) the cumulative impact of the Brady claim, newly discovered evidence, ineffective assistance of counsel, and the State's improper presentation of misleading evidence render the outcome of Way's trial materially unreliable.
[10] Issue (1), regarding the Brady claim, resulted in this Court reversing for an evidentiary hearing. The outstanding claims include: (2) improper limitation of the presentation of mitigation evidence and cross-examination of the State's witnesses; (3) the Court should recede from its cases precluding the consideration of lingering doubt as a mitigating factor; (4) the trial court erred in finding the aggravating circumstance that the murder occurred during the commission of an arson; (5) the trial court erred in finding the aggravating circumstance that Way was previously convicted of a violent felony based on his contemporaneous conviction for the murder of Carol Way; (6) the trial court erred in finding the HAC aggravating circumstance; (7) the court erred in finding the CCP aggravating circumstance; (8) the recommendation of death by a bare majority of jurors is not reliable; and (9) the death sentence is disproportionate.
[11] After Regalado's deposition on October 18, 1983, the following exchange occurred during a pretrial hearing on December 9, 1983:

Rankin [Defense Counsel]: Also, the Motion for Production of photographing, Mr. Benito has assured mehe can make the same representation here on the recordthat he has produced for me all those photographs which are available which relate in any manner to this investigation.
. . . .
Benito [Assistant State Attorney]: That is correct. That motion should have been rendered moot.
[12] The Supreme Court majority opinion in Kyles v. Whitley, 514 U.S. 419, 435 n. 8, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), noted: "This rule is clear, and none of the Brady cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone."
[13] Although in his reply brief Way asserts that he never adopted a mutual combat theory at the evidentiary hearing to explain the remaining head wounds, no other explanation for these severe injuries has been offered.
[14] Because we reject the underlying Brady claim on the grounds that Way failed to establish prejudice, we do not address the merits of his corresponding ineffective assistance of counsel claim. Even if trial counsel's performance was deficient because he should have discovered the photographs, the ineffective assistance of counsel claim is without merit because Way would not be able to establish the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Downs v. State, 740 So.2d 506, 513 n. 10 (Fla.1999); Mills v. State, 684 So.2d 801 (Fla.1996).
[15] Although Way's briefs also state that Fred Way, Jr., would have testified that he and his sister had been subject to police coercion at the time of the trial, Way made no proffer to this effect in the trial court. Accordingly, his claims that the trial court erred in excluding this testimony are not preserved for appellate review. See, e.g., Finney v. State, 660 So.2d 674, 684 (Fla.1995).
[16] We note that during the evidentiary hearing on the Brady claim, the defense presented expert testimony that an explosion resulted when an electrical spark ignited flammable vapors from refinishing chemicals. No expert testified concerning the theory that a propane gas tank caused the fire.
[17] We previously found that:

[Way's] argument principally revolves around the medical examiner's inability to determine the exact cause of death. Therefore, according to appellant, it must be assumed that the victims were totally incapacitated at the time of the fire and that his crime was not "unnecessarily torturous to the victim." State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). We disagree with appellant's view of the evidence and therefore find his argument to be without merit.
The medical examiner's report clearly shows that the victim was still alive at the time of the fire. She was observed by eye-witnesses to be on fire in the garage and struggling to move. Certain witnesses heard screams coming from the garage. It was not unreasonable for the trial court, based on all of the circumstances, to infer that the victim suffered immense mental agony from the time she was first struck until her death during the ensuing fire.
Way I, 496 So.2d at 128-29.
[18] This Court has previously rejected claims that the death penalty recommended by a bare majority of jurors is constitutionally infirm. See, e.g., Hunter v. State, 660 So.2d 244, 252-53 (Fla.1995); Alvord v. State, 322 So.2d 533 (Fla.1975), receded from on other grounds, Caso v. State, 524 So.2d 422 (Fla.1988).
[19] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[20] In fact, authors of a law review article examining the factors influencing juries to recommend the imposition of a life versus a death sentence in Florida concluded that the "existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor" in those cases studied where the jury recommended a life sentence. See William S. Geimer & Jonathan Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am. J.Crim. L. 1, 28 (1988).
[21] In many jurisdictions that have the death penalty, a vote of more than a bare majority of the jurors is required before the death penalty may be imposed. See Geimer & Amsterdam, supra, at 13 n. 49. In fact, as of 1988, twenty-five out of the thirty states requiring a jury verdict to support the death penalty explicitly required a unanimous jury verdict. Id. At the present time, Virginia, New York, Illinois and California are among the states that require a unanimous jury verdict. See Cal.Penal Code § 190.4(b) (West. 1999); 720 Ill. Comp. Stat. Ann. 5/9-1(g) (West.Supp.1999); N.Y.Crim. Proc. Law § 400.27(11)(a) (McKinney Supp.1999); Va. Code Ann. § 19.2-264.4(D)(1) (Michie Supp. 1999). Similarly, the Texas statute provides that a death sentence may not be imposed unless the jurors unanimously find that there are not "sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed," while a life sentence requires the agreement of ten jurors. Tex.Crim. P.Code Ann. § 37.071 (West Supp.2000); see Prystash v. State, 3 S.W.3d 522, 537 (Tex. Crim.App.1999), petition for cert. filed (U.S. Dec. 14, 1999) (No. 99-8503).