PER CURIAM.
Anthony Mungin was convicted of the 1990 murder of a convenience store clerk, Betty Jean Woods, and sentenced to death. See Mungin v. State (Mungin I), 689 So.2d 1026 (Fla.1995). Mungin appeals the postconviction court’s order summarily denying his successive motion for postcon-viction relief, filed pursuant to Florida Rule of Criminal Procedure 3.851, which *729 challenged his conviction on the basis that a newly discovered witness significantly impeaches the testimony of Ronald Kirkland, the only witness who identified Mun-gin as leaving the crime scene immediately after the murder.[1] The new witness, George Brown, asserts he was the first person on the scene after the murder and that no other person was present in the store. He states that he told this to police the night of the murder and that the police report is false. In the current proceeding, Mungin alleges that he was denied adequate adversarial testing because the newly discovered evidence from Brown impeaches Kirkland and shows that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).[2] For the reasons discussed below, we reverse and remand the Giglio and Brady claims to the postconviction court for an evidentiary hearing, but deny the newly discovered evidence claim.
The pertinent facts of this case are set forth in this Court’s opinion on direct appeal as follows:
Betty Jean Woods, a convenience store clerk in Jacksonville, was shot once in the head on September 16, 1990, and died four days later. There were no eyewitnesses to the shooting, but shortly after Woods was shot a customer [Kirkland] entering the store passed a man leaving the store hurriedly with a paper bag. The customer, who found the injured clerk, later identified the man as Mungin. After the shooting, a store supervisor found a $59.05 discrepancy in cash at the store.
Mungin was arrested on September 18, 1990, in Kingsland, Georgia. Police found a .25-caliber semiautomatic pistol, bullets, and Mungin’s Georgia identification when they searched his house. An analysis showed that the bullet recovered from Woods had been fired from the pistol found at Mungin’s house.
Jurors also heard Williams[3] rule evidence of two other crimes. They were instructed to consider this evidence only for the limited purpose of proving Mun-gin’s identity.
First, William Rudd testified that Mungin came to the convenience store where he worked on the morning of September 14, 1990, and asked for cigarettes. When Rudd turned to get the cigarettes, Mungin shot him in the back. He also took money from a cash box and a cash register. Authorities determined that an expended shell recovered from the store came from the gun seized in Kingsland.
Second, Thomas Barlow testified that he saw Meihua Wang Tsai screaming in a Tallahassee shopping center on the afternoon of September 14, 1990. Tsai had been shot while working at a store in the shopping center. A bullet that went through Tsai’s hand and hit her in the head had been fired from the gun recovered in Kingsland.
Mungin I, 689 So.2d at 1028 (footnote omitted).
*730 In his first motion for postconviction relief, Mungin raised several claims regarding Kirkland, specifically that trial counsel was ineffective for failing to cross-examine Kirkland regarding Kirkland’s criminal cases; trial counsel was ineffective for failing to effectively examine Kirkland regarding his identification of Mungin and for failing to elicit testimony from Detective Christie Conn that would have destroyed Kirkland’s credibility; and newly discovered evidence cast further doubt on Kirkland’s veracity. On appeal from the denial of postconviction relief, Mungin raised as an issue that the circuit court erred in denying his claims of ineffective assistance of trial counsel during the guilt phase after an evidentiary hearing, including his claim that counsel was ineffective in failing to adequately impeach Kirkland’s testimony. Mungin v. State (Mungin II), 932 So.2d 986, 998 (Fla.2006). This Court affirmed the denial of postconviction relief and denied Mungin’s petition for a writ of habeas corpus. Id. at 1004. In denying relief, this Court engaged in a significant discussion of the claims involving whether counsel was ineffective in failing to properly impeach Kirkland based on the failure to discover and use Kirkland’s probationary status as impeachment and the failure to call Detective Conn regarding statements that Kirkland made that called Kirkland’s identification of Mungin into question. See id. at 998-99. This Court denied relief, holding that even if counsel was deficient, Mungin did not establish prejudice because counsel had attacked Kirkland’s identification of Mungin on cross-examination of Kirkland and during his cross-examination of other witnesses who asserted that, days before the crime, Mungin had short hair. During closing, counsel stressed these inconsistencies. Id. at 999.
In the current proceeding, Mungin filed a successive motion for postconviction relief, asserting that the newly discovered evidence from Brown impeaches Kirkland and shows that the State violated Brady and Giglio. In support of this claim, Mun-gin presented the following affidavit, which potentially calls Kirkland’s testimony into question:
AFFIDAVIT OF GEORGE BROWN
1. My name is George Brown.... I hereby state the following and will attest to same in any official proceeding.
2. On Sunday, September 16, 1990, at approximately 1355 hours, at the Little Champ Store on the corner of Chaffee Road and Crystal Springs Road, I was an eyewitness to the following events. I remember these event [sic] because I go past this location everyday since that date sixteen years ago.
3. I went into the store that day because it was hot outside. The lady was usually at the counter and was always there — she always made you feel that you were going to steal something — and she was always there. I went into the store and got a drink and went to the counter and she was not there. So, I waited there for a few minutes and then I thought something was wrong. I went to the bathroom and yelled for her and nothing happened. I went back up front and still she didn’t come. At the end of the counter there was a door open, so I hollered in there and nothing happened and she didn’t come. So, I looked down and there she was. I called 911.
4. There was no one in the store during this whole time. I was in there all alone. There was no one in the parking lot. There was no one at the gas pumps. There was no one out there. There was someone who came out of the store, brushed up against me when I was coming in but I could not tell who it was, whether the person was a male or *731 female, white or black. I could never give a description of the person who was coming out of the store.
5. After I called 911, someone (a male) came into the store and asked what was happening. I was on the phone with 911 and told him that she was having a seizure and told him to roll her over on her side and then we heard this gurgling sound and the lady told us to roll her back on her back and we did.
6. The police officer came in at that time and he went over there and looked at her and decided to call the Life Flight. There was a cash drawer open on the register and the police officer told me that it was a Lottery drawer and it was always open. There was a glass of water next to the lady and a pill stuck to her lip — that is why I thought she was having a seizure and fell down.
7. I never noticed that there was any type of struggle in the store.
8. The police officer took over the situation and he asked me who found the lady and I told him that I had. He was really busy getting the Life Flight together. The guy that came in took over and pretended that he had been there the whole time. The man was not there when I got there and he did not find the lady. I told the police officer that I could not describe or ever identify the person that brushed past me, I just did not pay attention. The other guy was so busy talking and acting like he was there. I told the police officer if they didn’t need me any more, I was leaving.
9. There has never been any law enforcement officer, state attorney, investigator, defense lawyer, or anyone else come to talk with me since that day. I had no idea that anyone was identified or arrested or convicted for this crime.
10. I have reviewed a police report authored by K.D. Gilbreath, # 5182, dated November 5, 1990, which contained statements purportedly made by me at the only time I was ever spoken to by anyone about this case. The version of events as stated in the report is false.
10. [sic] On page 7 of the 14-page report in the last paragraph, Mr. Kirkland did not go into the store first. There was no one in the store when I came in. Mr. Kirkland came into the store after I called 911. Mr. Kirkland did not find the victim — it was me. Mr. Kirkland says in the report that he saw a black guy coming out of the store. This is not true because when I went into the store, someone was coming out and I could not identify anyone and no one was in the store when I was there.
11. On page 8 of the report, in the first paragraph, I remember the detective talking to me, but like I have said, Mr. Kirkland stepped up and tried to take over. I told the detective that I checked all the bathrooms to see where she was, and I checked everywhere because she was always in the front. I went over to where the counter was and there was a door open in the back — a little storage room. I turned around and saw her there and heard gurgling noises and that is when I called 911.
12. I looked over and saw the drawer open but I did not touch anything. The officer is incorrect to report that I checked the drawer of the cash register and then shut the drawer. That never happened.
13. I did not know the victim had been shot because I thought she had had a seizure because of the pill stuck to her lip and the water that was spilled next to her.
14. I told the officer that I was the only one in the store and Mr. Kirkland did not come into the store until after I called 911. There is no way he saw *732 anyone in the store because the person who brushed by me I could not identify, so there is no way that Mr. Kirkland could identify anyone, he was not in the store. I could not tell you what the person looked like and I was standing in the store a long time trying to find the lady.
15. I have always been available to testify at any proceedings and I am willing to testify as to what I observed on that particular day and to the falsehoods stated in the police report.
Mungin also presented the following affidavit from his original trial counsel, Charles Cofer, who discussed why he did not discover this information prior to trial:
AFFIDAVIT OF CHARLES G. COF-ER
1. My name is Charles G. Cofer, and I am presently a sitting county court judge in the Fourth Judicial Circuit in and for Duval County, Florida. I have previously been subpoenaed to give testimony in post-conviction proceedings in the case of State of Florida v. Anthony Mungin, and this affidavit is given in connection with further post-conviction proceedings.
2. Prior to taking the bench, I served as an Assistant Public Defender for the Fourth Judicial Circuit. During that time, I represented Anthony Mungin at the trial court level in the first-degree capital murder prosecution relating to the death of Betty Jean Woods. As lead counsel for Mr. Mungin, I had primary responsibility for all aspects of the case, and was familiar with the pre-trial discovery provided by the State of Florida.
3. I have recently been provided with an affidavit executed by an individual named George Brown, which states Mr. Brown’s knowledge concerning the death of Betty Jean Woods. I have also reviewed the homicide investigation report authored by Detective Gilbreath dated November 5, 1990. Detective Gil-breath was the lead law enforcement officer in charge of the investigation into Ms. Woods’ murder.
4. Mr. Brown’s affidavit contradicts the version of events as testified to at trial by the State’s key witness, Ronald Kirkland, in many significant ways. Ronald Kirkland was the primary prosecution witness based upon his assertion that he was the first and only person in the Lil’ Champ store, and that he was the one who discovered Ms. Woods after she was shot. Mr. Kirkland testified at trial that he observed a man coming out of the Lil’ Champ Store carrying a brown bag as he entered the store. Kirkland later identified this man as Anthony Mungin. Because there were no eyewitnesses to the murder, Kirkland’s identification of Mr. Mungin was extremely important evidence. Although I attempted to undermine Kirkland’s testimony during cross-examination, any evidence that was available that I could have used to further undermine his credibility (especially his purported identification of Anthony Mungin) would have been useful and would have been presented. I would also expect, under the State’s obligation under Brady v. Maryland, that the prosecution would disclose to me any favorable evidence which could have been used to impeach Kirkland or otherwise undermine his testimony and identification of Mr. Mungin.
5. Prior to trial, the State provided me with a copy of Detective Gilbreath’s homicide report, in which there is brief mention made of George Brown and the information he supposedly told Detective Conn when he was interviewed on the day Ms. Woods was shot. I relied on this police report as being an accurate and truthful account of what Mr. Brown told *733 the police. The version of Mr. Brown’s statement contained in the homicide report generally supported the version of facts provided by Mr. Kirkland, and provided no suggestion that Mr. Brown had information that would be useful to impeach Mr. Kirkland’s version of the events.
7. [sic] Because the information contained in the police report appeared to be of much less importance than the information provided by Kirkland, and due to the fact that Kirkland became the chief prosecution identification witness, our efforts focused on attempting to undermine Kirkland’s testimony at trial. Because I relied on the veracity of the police report, apparently no one from the defense team contacted or spoke with Mr. Brown prior to trial.
8. Mr. Brown’s affidavit contradicts Mr. Kirkland’s version of events, and demonstrates that the police report was inaccurate in terms of explaining the information that Mr. Brown provided to law enforcement. When handling criminal cases, I expected the State to provide me with an accurate recitation of what witnesses told the police, but I was never provided with the information contained in Mr. Brown’s affidavit. Had the State provided me with an accurate report containing the true version of events that Mr. Brown witnessed, this would have made a tremendous difference in terms of the presentation of Mr. Mungin’s case. Every effort would have been made to interview Mr. Brown and to present his conflicting testimony, given that it contradicts and impeaches Kirkland’s version of events and his identification of Anthony Mungin.
9. It is my understanding that Mr. Brown is an unbiased witness with no prior criminal background, in contrast to Mr. Kirkland, who had an extensive criminal history and whose credibility was already in question. It would have been helpful to have a disinterested witness with no criminal background who would have been able to testify and contradict Kirkland’s testimony. However, the State never provided me with an accurate and truthful account of Mr. Brown’s involvement in the case.
Based on the affidavits of Brown and Cofer, Mungin asserts that he is entitled to relief under Brady, Giglio, or newly discovered evidence. The trial court held a Huff[4] hearing to determine whether an evidentiary hearing was needed and then denied relief, finding that Mungin failed to demonstrate prejudice. Determining whether the trial court erred in denying an evidentiary hearing on a successive rule 3.851 motion is a question of law subject to de novo review. Darling v. State, 45 So.3d 444, 447 (Fla.2010). Because the circuit court denied Mungin’s motion without an evidentiary hearing, this Court must ác-cept all factual allegations in the motion as true to the extent they are not conclusively refuted by the record. Id. The Court will affirm the ruling “[i]f the motion, files, and records in the ease conclusively show that the movant is entitled to no relief.” Id.; see also Fla. R.Crim. P. 3.851(f)(5)(B) (providing that a successive postconviction motion in a capital case may be denied without an evidentiary hearing if “the motion, files, and records in the case conclusively show that the movant is entitled to no relief’). The Court will uphold the post-conviction court’s summary denial “if the motion is legally insufficient or its allegations are conclusively refuted by the record.” Darling, 45 So.3d at 447 (quoting Ventura v. State, 2 So.3d 194, 198 (Fla.2009)).
*734 Here, Mungin has raised three claims pertaining to the Brown affidavit: (1) the State violated Brady in failing to disclose the favorable evidence pertaining to Brown; (2) the State violated Giglio by knowingly presenting false evidence; and (3) Brown’s affidavit constitutes newly discovered evidence that mandates a new trial. In looking at the three different claims raised regarding Brown’s testimony, we review the different legal standards involved, starting with Mungin’s Brady claim.
The Fifth and Fourteenth Amendments to the United States Constitution require a prosecutor to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to establish a Brady violation, the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Way v. State, 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Way, 760 So.2d at 913 (quoting Bagley, 473 U.S. at 682, 105 S.Ct. 3375). A reasonable probability is a probability sufficient to undermine this Court’s confidence in the outcome. Id.; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. However, in making this determination, a court cannot “simply discount ] the inculpatory evidence in light of the undisclosed evidence and deter-min[e] if the remaining evidence is sufficient.” Franqui v. State, 59 So.3d 82, 102 (Fla.2011). “It is the net effect of the evidence that must be assessed.” Jones v. State, 709 So.2d 512, 521 (Fla.1998).
In denying relief on the Brady claim, the postconviction court concluded that Mungin failed to show that the evidence was material. In its order, the post-conviction court noted that there were three differences between what Brown alleged in his affidavit that he told the police officer at the scene of the crime and what was stated in the arrest report, concluding that none of these were material or would undermine confidence in the outcome. Specifically, the court found as follows:
There appear to be three differences between what Mr. Brown alleges in his affidavit that he told the officer on the date of the murder, and what the arrest report indicates Brown told the officer. First, Brown alleges that he told the detective that Kirkland anived after he, Brown, had discovered Ms. Woods and called 911, whereas the report indicated that Brown and Kirkland “entered the store at the same time.” Second, Brown alleges that he did not touch the cash register, whereas the report indicates that he “checked the registers.” Third, Brown alleges that someone had come out of the store as he was entering, but that he told the police that he could not describe the person, whereas the report indicates that he did not “notice” anyone leaving the store as he entered. None of Brown’s other allegations that conflict with Kirkland’s testimony is alleged to have been shared with police.
Even if it were assumed that the State erroneously withheld this information, Defendant suffered no prejudice from the failure to disclose. First, most of the allegedly withheld statements are not particularly material. The second *735 and third discrepancies noted above constitute minor differences in the characterization of events. The only material discrepancy was Mr. Brown’s allegation that he told the officer that he was the only person in the store and that Kirkland did not come into the store until after Brown called 911. While this discrepancy might have been used to impeach Kirkland’s testimony, it does not create a reasonable probability of a different outcome given the importance of Kirkland’s testimony compared to other trial evidence.
It is critical to recognize that the undersigned presided over Defendant’s trial, and has a very vivid recollection of the trial evidence, which was overwhelming even without Kirkland’s testimony.[5] Uncontroverted ballistics evidence was presented directly tying Defendant to the shooting of Ms. Woods. When Defendant was arrested, police found a .25-caliber semiautomatic pistol, bullets, and Defendant’s Georgia identification when they searched his house. An analysis showed that the bullet recovered from Woods had been fired from the pistol found at Defendant’s house. Moreover, the robbery/murder in this case was the third in a series of robberies and shootings, all of which were committed with the same gun, the gun found in Defendant’s bedroom. Furthermore, Defendant was positively identified as the person who had committed the first two robbery/shootings, and the car he used in the first two robberies had been stolen from near his home and then abandoned not far from the scene of the instant robbery/murder. Another car stolen from that area ended up next to Defendant’s home with two expended shells from the murder weapon in it. In short, Defendant used the murder weapon in two robbery/shootings not long before the instant robbery/murder, had possession of the murder weapon following the instant robbery/murder, and was directly connected to the two cars used in the three robbery/shootings.
George Brown’s affidavit does not allege that a person other than Defendant robbed and killed Ms. Woods, or that Defendant could not have been the killer. Brown’s allegation could only provide[ ] further impeachment of details of Kirkland’s testimony and his identification of Defendant as the person he saw leaving the store. Even if Defendant’s motion demonstrated that the State improperly withheld information from the defense, that information does not establish a reasonable probability of a different outcome sufficient to undermine confidence in the outcome of the trial. Evaluation of the [sic] all of the evidence introduced at trial demonstrates that it was overwhelming even if Kirkland’s identification could have been called into doubt by Brown’s testimony. As such, Defendant’s claim of a Brady violation is conclusively refuted by the record.
In reviewing this claim, we examine Kirkland’s trial testimony in even more detail. At trial, Kirkland testified that he was the first person to arrive at the location of the shooting. On his way to his girlfriend’s house, he stopped by the Lil’ *736 Champ convenience store to pick up a diet coke and breath savers. As he was going into the store, a man who was carrying a brown paper bag almost knocked him down on his way out of the store. He described the man as being shorter than five feet, six inches and weighing about 130 pounds. Kirkland went into the store, picked up his items, and waited for the clerk, finally noticing that she was lying on the floor. He thought she might have had a seizure so he attempted CPR, and while he was performing CPR, another customer came in and called 911. Kirkland alleged that the other customer looked at the cash register and pulled the drawer open. An officer later came to his home and showed him six or seven pictures. Kirkland identified a picture of Mungin as the man who he saw leaving the store. He further identified Mungin in court as the man who he saw.
On cross-examination, defense counsel confronted Kirkland on a number of inconsistencies. For example, although Kirkland was able to identify Mungin as the person he met, he stated he had only a glimpse of him before they bumped into each other, and since Mungin was then traveling in a different direction away from him, Kirkland saw only the back of his head. However, Kirkland was unable to recall if Mungin wore a hat and could not describe whether he was wearing a light or dark shirt. Further, Kirkland stated that Mungin had long hair that appeared to be in a Jheri-curl style and had a “good bit” of beard growth on him— a description that differed from Mungin’s appearance at the time of the crime. When the police first asked Kirkland to identify the person leaving the crime scene, Kirkland stated that he was not sure if he could recognize the person again, but he would try. When he was shown the pictures, Kirkland reviewed the photographs for approximately fifteen minutes before he picked Mungin’s photo as the person that he saw.
During closing argument, defense counsel stressed the following inconsistencies: at the time that Kirkland noticed the person rushing out of the convenience store, he did not realize it was a murder scene but was thinking about his upcoming date; Kirkland admitted that he saw only the back of the person’s head and not his face; Kirkland admitted he saw only a glimpse as the person rushed away; Kirkland was unable to identify any of the clothing that the person was wearing; and most importantly, Kirkland described the person he saw as having a beard and hair that was “kind of long” even though other eyewitnesses to the Tallahassee shooting (which occurred two days earlier) stated that Mungin’s hair was so short that it looked like he was in the military. Thus, defense counsel asserted that Kirkland’s testimony supported that the person he saw leaving the store could not have been Mungin because a person would be unable to make hair grow significantly in only two days.
During prior postconviction proceedings, this Court discussed the value of Kirkland’s testimony as follows:
Mungin’s first subclaim is that trial counsel was ineffective for failing to sufficiently impeach the testimony of Ronald Kirkland. Specifically, Mungin argues that Cofer should have made the jury aware that Kirkland was on probation at the time of the trial and that warrants had been issued for Kirkland’s arrest on violation of probation and subsequently recalled.
Even if Cofer’s performance was deficient because he failed to discover and use Kirkland’s probationary status as impeachment evidence, Mungin has failed to establish prejudice. Cofer attacked Kirkland’s identification of Mun- *737 gin on cross-examination of Kirkland, and by his cross-examination of the victim of the Monticello shooting and the eyewitness to the Tallahassee shooting, whose descriptions of the perpetrator were different from Kirkland’s. In closing argument, Cofer argued extensively that due to these inconsistencies, Kirkland’s identification could not be believed beyond a reasonable doubt. Moreover, Kirkland testified that he did not tell anyone from the State Attorney’s Office that he was on probation and that he did not have any deals with the State in exchange for his testimony at Mungin’s trial. Mungin does not allege that any deals were made. As for trial counsel’s failure to inform the jury of the recalled warrants for Kirkland’s arrest, because the warrants were not recalled until after the trial it cannot be said that counsel’s performance was deficient.
Even assuming that counsel’s performance was deficient in this regard, we conclude that Mungin has failed to establish prejudice. As noted above, trial counsel attacked Kirkland’s identification of Mungin on cross-examination by bringing out the limited time he had to actually view the perpetrator and the fact that it took him fifteen to twenty minutes to pick Mungin out of the photo lineup. Cofer also brought Kirkland’s identification into question by his cross-examination of the victim of the Monticello shooting and the eyewitness to the Tallahassee shooting, who gave different descriptions of the perpetrator than did Kirkland.
Mungin II, 932 So.2d at 998-99 (footnote omitted). We concluded that Mungin was not entitled to relief because our confidence in the outcome of Mungin’s trial was not undermined.
However, Brown’s testimony completely contradicts Kirkland on a material detail: whether Kirkland could have seen Mungin leaving the convenience store right after the murder. Kirkland, who testified at trial, claimed that he was the first person on the scene and identified Mungin as leaving the murder scene. Brown, in direct contradiction, asserts that he was first on the scene and that no other witnesses were present during the entire time he was searching for the missing clerk. Brown alleges that he found the victim and called 911. In referring to Kirkland, Brown swears in his affidavit that Kirkland came in and “pretended that he had been there the whole time. The man was not there when I got there and he did not find the lady.” If, in fact, the trial judge upon remand determines Brown is being truthful, this would clearly mean that Kirkland was untruthful at trial, which might have been critical testimony for the jury. We are troubled by the possibility that a false police report was submitted and then relied on by defense counsel. Without an evidentiary hearing to explore this issue, we are left with mere speculation as to what in fact occurred, what the police knew, what the prosecutor knew, and whether Kirkland, a witness with an extensive criminal history, was lying when he testified at trial. In reviewing the Brady claim presented, accepting all allegations in the motion as true to the extent they are not conclusively refuted by the record, we cannot agree that the record at this point conclusively shows that the evidence was not material (i.e., that there was not “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different”). Way, 760 So.2d at 913 (quoting Bagley, 473 U.S. at 682, 105 S.Ct. 3375). Accordingly, we reverse and remand this claim to the postconviction court for an evidentiary hearing pertaining to *738 Brown and the allegation that the police report was false.
Mungin also asserts that this evidence establishes a Giglio violation. Under Giglio, “a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.” Rhodes v. State, 986 So.2d 501, 508-09 (Fla.2008). As to the knowledge prong, in Guzman v. State, 868 So.2d 498 (Fla.2003), we have clarified that Giglio is satisfied where the lead detective testifies falsely at trial because the “knowledge of the detective ... is imputed to the prosecutor who tried the case.” Id. at 505.
The materiality prong of Giglio is more defense-friendly than in a Brady claim. See Davis v. State, 26 So.3d 519, 532 (Fla.2009) (“[T]he standard applied under the third prong of the Giglio test is more defense friendly than the test ... applied to a violation under Brady.”), cert. denied, — U.S. -, 130 S.Ct. 3509, 177 L.Ed.2d 1097 (2010). While under Brady, evidence is material if a defendant can show “a reasonable probability that ... the result ... would have been different,” Way, 760 So.2d at 913 (emphasis added), under Giglio, the evidence is considered material simply “if there is any reasonable possibility that it could have affected the jury’s verdict.” Rhodes, 986 So.2d at 509 (emphasis added). Accordingly, for the reasons addressed above, we likewise hold that after reviewing the Giglio claim presented and accepting all allegations in the motion as true to the extent they are not conclusively refuted by the record, we cannot agree that the record at this point conclusively shows that the evidence pertaining to Brown would not affect the jury’s verdict. Accordingly, an evidentiary hearing is needed on this claim as well.
Our analysis is different, however, in considering Mungin’s claim that based on this newly discovered evidence, he is entitled to relief under Jones v. State, 709 So.2d 512 (Fla.1998). In order to be considered newly discovered: (1) “the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence”; and (2) the evidence “must be of such nature that it would probably produce an acquittal on retrial.” Jones, 709 So.2d at 521 (internal quotation marks and citation omitted). In making this determination, a trial court must “consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.” Id. (internal quotation marks omitted). We deny this claim because the information provided by Brown is not of such a nature that it would probably produce an acquittal on retrial. The jury heard significant evidence during the trial that established Mungin as the killer, including testimony that Mungin stole a red Escort and was engaged in similar shootings a few days before the murder, the stolen car was later discovered in Jacksonville, and the shell casing and bullet left at the scene of the murder were identified as matching the gun found at Mungin’s home.
For the reasons addressed above, we reverse and remand the Brady and Giglio claims to the postconviction court for an evidentiary hearing pertaining to Brown and the allegation that the police report was false. We express no opinion on the merits of these claims. The parties shall proceed in an expedited manner, and an evidentiary hearing on this claim shall be held and an order entered within 120 days of the remand.
It is so ordered.
*739 PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, C.J., concurs.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Mungin also alleges that existing procedures utilized by Florida in carrying out executions by lethal injection violate the Eighth Amendment; however, he provides no additional factual allegations that would alter our previous decisions. See Schoenwetter v. State, 46 So.3d 535, 550 (Fla.2010); Tompkins v. State, 994 So.2d 1072, 1081 (Fla.2008); Lightbourne v. McCollum, 969 So.2d 326 (Fla.2007). We deny this claim without further discussion.

.Williams v. State, 110 So.2d 654 (Fla.1959).

. Huff v. State, 622 So.2d 982 (Fla.1993).

. We caution that trial courts must decide these postconviction matters on an objective basis. See, e.g., Guzman v. State, 941 So.2d 1045, 1051 n. 4 (Fla.2006) (recognizing that trial courts are to make an objective determination as to the effect of a Giglio error; it cannot be a subjective assessment). In this case, because the motion was denied without an evidentiary hearing, we must accept Mun-gin's allegations as true and determine prejudice by reviewing whether our confidence in the outcome is undermined.