PER CURIAM.
This case is before the Court on appeal from an order denying a successive motion to vacate a judgment of conviction for first-degree murder and a sentence of death filed under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution.
In his successive motion, the defendant, Anthony Mungin, challenged his conviction on the basis that he recently discovered that a witness’s testimony differed significantly from the police report, therefore impeaching the testimony of Ronald Kirkland, the only witness who identified Mun-gin as leaving the crime scene immediately after the murder. Contrary to Kirkland’s testimony at trial, the new witness, George Brown, asserted that he was the first person to arrive and no other person was present until after he found the victim and called 911. Mungin sought relief, asserting that the newly discovered evidence from Brown impeaches Kirkland and demonstrates that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We reversed the postconviction court’s order that summarily denied all relief and remanded the Brady and Giglio claims to the postconviction court for an evidentiary hearing, but affirmed the order denying the newly discovered evidence claim. Upon remand, the postconviction court held the necessary ev-identiary hearing and subsequently denied relief. For the reasons discussed below, we affirm the denial of relief.
FACTS
The pertinent facts of this ease are set forth in this Court’s opinion on direct appeal as follows:
Betty Jean Woods, a convenience store clerk in Jacksonville, was shot once in the head on September 16, 1990, and died four days later. There were no eyewitnesses to the shooting, but shortly after Woods was shot a customer [Kirkland] entering the store passed a man leaving the store hurriedly with a paper bag. The customer, who found the injured clerk, later identified the man as Mungin. After the shooting, a store supervisor found a $59.05 discrepancy in cash at the store.
Mungin was arrested on September 18, 1990, in Kingsland, Georgia. Police found a .25-caliber semiautomatic pistol, bullets, and Mungin’s Georgia identification when they searched his house. An analysis showed that the bullet recovered from Woods had been fired from the pistol found at Mungin’s house.
Jurors also heard Williams [1] rule evidence of two other crimes. They were instructed to consider this evidence *141 only for the limited purpose of proving Mungin’s identity.
First, William Rudd testified that Mungin came to the convenience store where he worked on the morning of September 14, 1990, and asked for cigarettes. When Rudd turned to get the cigarettes, Mungin shot him in the back. He also took money from a cash box and a cash register. Authorities determined that an expended shell recovered from the store came from the gun seized in Kingsland.
Second, Thomas Barlow testified that he saw Meihua Wang Tsai screaming in a Tallahassee shopping center on the afternoon of September 14, 1990. Tsai had been shot while working at a store in the shopping center. A bullet that went through Tsai’s hand and hit her in the head had been fired from the gun recovered in Kingsland.
Mungin v. State (Mungin I), 689 So.2d 1026, 1028 (Fla.1995) (footnote omitted). On direct appeal, this Court affirmed Mun-gin’s first-degree murder conviction and sentence of death. Id. at 1082. Mungin then filed a motion for postconviction relief, asserting that his trial counsel was ineffective based on numerous alleged errors, among other claims, which was denied. This Court affirmed the denial of postconviction relief and denied Mungin’s petition for a writ of habeas corpus. Mungin v. State (Mungin II), 932 So.2d 986 (Fla.2006).
In the current proceeding, Mungin filed a successive motion for postconviction relief, asserting that the newly discovered evidence from Brown impeaches Kirkland and shows that the State violated Brady and Giglio. In support of this claim, Mun-gin presented an affidavit from Brown, in which Brown stated that he was the first person to arrive at the store and was in the store by himself during the entire time it took for him to select his purchases, wait for the cashier, search the store for her until he discovered the victim, and then call 911, at which point another man entered the store. Brown further stated in his affidavit that when he entered the store, another person brushed by him on his way out, and that he told the police this information — information that was contrary to statements in the police report that indicated Kirkland was the first person to arrive.
The postconviction court summarily denied relief, and Mungin appealed. On review, this Court detailed the requirements of establishing a newly discovered evidence claim, a Brady claim, and a Giglio claim. Mungin v. State (Mungin III), 79 So.3d 726, 734, 738 (Fla.2011). While both Brady and Giglio required materiality in order to grant relief, we recognized that a Giglio violation had a more defense-friendly materiality prong than a Brady claim. Mungin III, 79 So.3d at 738. Ultimately, we concluded that under either Brady or Gig-lio, the record did not conclusively show that the evidence was not material, and thus we remanded those claims to the postconviction court for an evidentiary hearing pertaining to Brown’s affidavit and the allegation that the police report was false. Mungin III, 79 So.3d at 737-38. However, we held that the same conclusion did not apply to the newly discovered evidence claim, which required that Mungin demonstrate that the evidence was “of such nature that it would probably produce an acquittal on retrial” — a standard that he could not meet. See id. at 738 (quoting Jones v. State, 709 So.2d 512, 521 (Fla.1998)).
After this Court remanded the action, the postconviction court held a hearing where numerous witnesses testified, including Brown and various law enforcement officers. The postconviction court *142 subsequently denied relief. Mungin now seeks review of this order, asserting that the postconvietion court erred in denying both the Brady claim and the Giglio claim. He also asserts that the postconviction court erred in denying a motion for disqualification based on this Court’s order remanding the case for an evidentiary hearing. We affirm the denial of relief and hold that the postconviction court did not err in denying the motion for disqualification.
ANALYSIS

Brady

In order to establish a Brady violation, “the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.” Mungin III, 79 So.3d at 734 (citing Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Way v. State, 760 So.2d 903, 910 (Fla.2000)). To meet the materiality prong, the defendant must demonstrate “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Id. (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. However, in making this determination, a court cannot “simply discount ] the inculpatory evidence in light of the undisclosed evidence and determin[e] if the remaining evidence is sufficient.” Franqui v. State, 59 So.3d 82, 102 (Fla.2011). “It is the net effect of the evidence that must be assessed.” Jones, 709 So.2d at 521.
Brady claims present mixed questions of law and fact. Where the postconviction court has conducted an evi-dentiary hearing, this Court will defer to the factual findings of the postconviction court so long as those findings are “supported by competent, substantial evidence, but will review the application of the law to the facts de novo.” Hurst v. State, 18 So.3d 975, 988 (Fla.2009).
In this case, the postconviction court denied the Brady claim, finding that Mun-gin failed to establish the second prong of Brady:
Based on the testimony presented during the evidentiary hearing, this Court finds that the Defendant has not established a Brady violation. While Mr. Brown testified that he was the first and only person on the scene until he called 911, Mr. Brown testified that he did not provide this information to the police. Mr. Brown specifically stated that he did not relay this information to the officers on the scene, explaining that “the other guy” took over. At one point during the hearing, Mr. Brown testified that he did tell officers that he was nudged by someone when entering the store, however, he later clarified that he was not certain whether or not he told the officers of this and stated that he was so nervous from finding someone shot that he “may not have said it.” As Mr. Brown testified, this was a traumatic event for him. Additionally, Officer Conn clearly testified that Mr. Brown never told her that he was the first and only person in the store, nor did he tell her that someone bumped into him when he entered the store.
Mr. Brown’s testimony may have impeached Mr. Kirkland’s testimony. However, the Defendant has not established that this information was willfully or inadvertently suppressed by law en *143 forcement or the State. To the contrary, the evidence indicates that the police and prosecutor were not aware of Mr. Brown’s version of events. Thus, the Defendant’s Brady claim is denied.
The postconviction court also held that Mungin failed to establish the third prong of Brady because he failed to establish a reasonable probability that, had Brown’s testimony been disclosed, a different result would have occurred. In particular, the court stated that Kirkland’s testimony at trial had already been significantly called into question and that Kirkland’s identification of the person leaving the store did not match Mungin; accordingly, Kirkland’s testimony may not have even incriminated Mungin. In addition, the court found that other substantial evidence established Mungin’s guilt.
We affirm the postconviction court’s order because competent, substantial evidence supports the postconviction court’s finding that Mungin failed to show that the State willfully or inadvertently suppressed favorable evidence — a prong that Mungin must demonstrate in order to prevail on his Brady claim. The postcon-viction court made several findings of fact that are pertinent to this claim. First, the court pointed out that Brown himself stated consistently that he did not tell the police the same facts that he testified to at the hearing because the “other guy” took over. While the court recognized that Brown did make some statements that he told the officers that somebody leaving the store nudged him, Brown later testified that he was not sure whether he informed the officers about this person. The record provides ample support for these findings. From the very beginning of the hearing, Brown testified as follows:
Q: And did there come a point where you spoke with any police officers who arrived at the scene?
A: Yes, sir.
Q: And did you tell them what you testified to here today?
A: No. I really didn’t get a chance to. The other guy — you know, there was news people and everything and the other guy was there.
THE COURT: Just a second now. You said, did you talk to them. That them I don’t know what them is.
BY MR. SCHER [defense counsel]:
Q: Right.
Q: Do you remember speaking to any particular police officers?
A: Yes, sir. But I don’t remember his name.
[[Image here]]
Q: Were you still in the store when you were speaking with the police or were you outside or can you explain how that happened?
A: Outside. I was outside.
Q: Were there a number of other people outside besides just you?
A: Yeah, by then, there was a bunch of people there.
Q: Was the other gentleman who had come to the store also there speaking to the police with you?
A: Yes, sir.
Q: So were you both essentially talking to the police at the same time?
A: Yes, sir. He was kind of taking over all the conversation so I pretty much asked the officer if he needed me for anything and if he didn’t need me any more I was going.
(Emphasis added.) The postconviction court requested more clarification regarding the statements that Brown gave to the police:
THE COURT: You spoke to some police officers at the scene?
THE WITNESS: Yes, sir.
*144 THE COURT: And as I recall what you said, a male police officer?
THE WITNESS: Yes, sir. He’s — I mean I might have spoke to someone else but I can’t remember.
[[Image here]]
THE COURT: Do you — can you recall specifically what you might have told them at the time? Well, let me ask you this: Do you think what you told them at the time was consistent with what you put in your affidavit previously?
THE WITNESS: Yes, sir. I was trying to. That’s what I was saying. I was trying to and then the other guy was— because he kind of asked me what was going on when he came in the store as I called the 911 but he was kind of like talking over the top of me.
During cross-examination, the prosecutor asked Brown whether he told the police that he observed a person leaving the store as he entered:
Q: All right. And you did not tell that to the police though, did you?
A: Yeah.
Q: You did?
A: I think I did, yes, sir.
[[Image here]]
Q: You’re not sure. Thinking means you’re not sure, right?
A: Right. I’m not sure.
Q: Okay. And the only reason is because that what you just read, that affidavit that you read, the attached report on it, the last line that defense counsel did not ask you about, it states that you stated he stated he did not notice anyone leaving the store as he entered. That’s what the detectives put down that you told that detective.
A: Right. I was so nervous finding somebody shot I may not have said it.
Q: Okay. So it is possible that that’s what you told them, that you didn’t even mention to the detective that you had noticed anybody leaving the store?
A: It’s possible.
Q: Okay.
A: But as I — as I got time to kind of calm down a little bit then I did remember somebody coming out as I was going in.
Q: Okay. And you never contacted the police after that day to tell them that?
A: No, sir.
In addition, the prosecutor elicited more information from Brown as to what Brown heal’d the other man tell the police:
Q: Okay. And you’re saying that the police came up and then he just kind of took over and you just stayed in the background and you knew this guy was lying and you just let him talk and lie?
A: Well, I didn’t know he was lying. I was just — he kind of took over because as we were trying to see what they wanted us to do he was asking me what happened to her and everything.
Q: Right.
A: So I told him what I did.
Q: What do you remember the guy saying that you claim came after you and took all this credit? What do you remember him saying to the police?
A: Pretty much what I told him.
Q: Which was what?
A: What I told you already, what I’ve already testified to.
Q: Well, if you could tell me again what you remember this man telling the police.
A: I remember — I guess he was telling them about, you know, that he saw somebody coming in the store, pretty much the same thing as I did.
*145 Q: So he described the man to the police, right?
A: I believe so.
Q: Yeah.
A: No, he didn’t describe — when I heard him he wasn’t describing the man.
Q: So what was this man telling the police?
A: That we found the lady there, pretty much we found the lady there shot and called 911.
After defense counsel rested, the State called Officer Charles Wells, who was the first responding officer to the crime scene. Officer Wells talked to the witnesses, but did not take their full account. He testified that Brown never told him a person brushed up against him on the way into the store, and he had no recollection of Brown claiming to be the first person in the store. On cross-examination, when defense counsel asked Officer Wells about his report that mentioned only Kirkland by name, Officer Wells stated, “Mr. Brown didn’t tell me anything. He just agreed with Mr. Kirkland.” The judge inquired about that statement further, asking how Brown indicated that he agreed. Officer Wells replied that Brown simply nodded.
Detective Conn arrived at the scene fifty minutes later in plain clothes and identified herself as an officer. She took statements from all the witnesses on a one-on-one basis and took shorthand notes while she was conducting the interviews. She was deposed before Mungin’s initial trial where she read her notes as to what Brown told her. Detective Conn testified at the evidentiary hearing that Brown had never told her that he was the only person who was inside the store by himself. She further stated that Brown never told her that somebody leaving the store had bumped into him.
In fully reviewing the record, we conclude that the postconviction court’s findings are supported by competent, substantial evidence. While Brown made some statements that he attempted to provide the police with the same information as he stated in his affidavit, he also acknowledged during his testimony that Kirkland was the person who told the police Brown’s side of the story. Moreover, Brown never definitively stated what he told the police himself. Instead, the record reflects that the more he was questioned specifically as to what information he told the police, the less sure he was. In fact, at one point, Brown even admitted that he heard Kirkland tell the police that a person bumped into Kirkland on his way out of the store when Kirkland first arrived, thus acknowledging that Brown was aware Kirkland was claiming to be first on the scene. In summary, the record is devoid of any evidence that the State inadvertently or willfully suppressed favorable evidence. Accordingly, as Mungin failed to present sufficient evidence to support the second prong of Brady, we affirm the denial of relief as to this claim.

Giglio

Next, 'Mungin alleges that the State knowingly presented false testimony in violation of Giglio. In order to prove a Giglio violation, “a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.” Tompkins v. State, 994 So.2d 1072, 1091 (Fla.2008) (quoting Rhodes v. State, 986 So.2d 501, 508-09 (Fla.2008)). If the first two prongs are established, the Court will then consider whether the evidence is material by determining “if there is any reasonable possibility that it could have affected the jury’s verdict.” Tompkins, 994 So.2d at 1091. At this point, the burden then switches to the State, which must *146 “prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt.” Id. (quoting Rhodes, 986 So.2d at 509).
The postconviction court denied the Gig-lio claim, finding as follows:
This Court finds that the Defendant has not established a Giglio violation. First, the Defendant has not shown that the prosecutor presented or failed to correct false testimony, in that the Defendant has not shown that Mr. Kirkland’s testimony was false. Instead, the Defendant has merely shown that Mr. Brown’s version of events is inconsistent with Mr. Kirkland’s version. It is not uncommon that two witnesses perceive events differently. Further, assuming arguendo that Mr. Kirkland’s testimony was false, the Defendant has not shown that the prosecutor knew the testimony was false. The evidence introduced at the hearing showed that neither the police, nor the prosecutor, knew of Mr. Brown’s version of events. This Court finds Mr. de la Rionda’s testimony [the lead prosecutor] that he never knew of Mr. Brown’s version of events to be credible. Additionally, the testimony of Mr. Brown and Officer Conn corroborated Mr. de la Rionda’s testimony. Therefore, the Defendant’s Giglio claim is denied.
Much of the evidence that allegedly supports this claim has already been discussed above, which details the lack of evidence pertaining to whether Brown informed the police that he bumped into a person who was leaving the store as he entered and that Brown was the first person to arrive at the scene and was present by himself for some time before Kirkland arrived. At the evidentiary hearing, however, Bernardo de la Rionda, the lead prosecutor at Mungin’s trial, also testified that he had no knowledge that Brown was alone in the store with the victim until the 911 call was made or that Brown encountered a person leaving the store when he entered. In addition, the lead prosecutor testified that while he was in communication with law enforcement during the trial, at no point was he aware of any law enforcement officer who knew of such facts. He affirmatively stated that Brown did not contact his office and he had no knowledge of the allegations until the current postconviction proceedings.
We affirm the circuit court’s ruling. Although Brown’s testimony does call into question whether Kirkland could have seen Mungin leaving the store shortly after the shooting, because Mungin is bringing this claim as a Giglio violation, he must show that the prosecutor presented or failed to correct false testimony and that the prosecutor knew the testimony was false. Here, the testimony presented during the post-conviction evidentiary hearing fails to establish that the prosecutor, or any person with whom he was in contact, knew Brown’s version of the events. In fact, Brown himself acknowledged that he was aware Kirkland was informing the police as to his version of the story and that Kirkland was attempting to be in the spotlight and take credit. Brown did not correct Kirkland’s version of the facts that he had provided to the police. Moreover, while Brown asserted that he tried to tell the police what he saw, he also acknowledged that he may not have told them that he observed somebody leaving the store as he entered. Likewise, the lead prosecutor testified that he did not know this information until the current proceedings and, to his knowledge, nobody in law enforcement was aware of Brown’s postconviction version of the facts. In looking to the testimony as a whole, there is no testimony to establish either of the first two prongs of Giglio. Accordingly, we affirm the post- *147 conviction court’s denial of the Giglio claim.
Cumulative Error
Mungin contends that the postconviction court erred in failing to conduct a cumulative error analysis by reviewing his Brady and Giglio claims in conjunction with the other claims he alleged in prior proceedings. However, Mungin is not entitled to relief because the Court does not conduct a cumulative error analysis where all of the claims are found to be meritless. See, e.g., Walker v. State, 88 So.3d 128, 137 (Fla.2012) (“Because Walker has failed to provide this Court with any basis for relief in any of his postconviction claims, Walker is not entitled to relief based on cumulative error.”). Thus, we deny relief on this claim.
Motion to Disqualify
In his final claim, Mungin alleges that the postconviction court erred in denying his motion to disqualify, relying solely upon this Court’s order that held that the postconviction court erred in summarily denying the successive postconviction claims without granting an evidentiary hearing as to two of the claims. Mungin is not entitled to relief on this claim. This Court has repeatedly held that generally a previous adverse ruling is a facially insufficient reason for disqualification. See, e.g., Mendoza v. State, 87 So.3d 644, 664 (Fla.2011) (“[Ajdverse rulings by a judge are generally considered legally insufficient to warrant a judge’s disqualification.”); Rivera v. State, 717 So.2d 477, 481 (Fla.1998) (“The fact that the judge has made adverse rulings in the past against the defendant, or that the judge has previously heard the evidence, or ‘allegations that the trial judge had formed a fixed opinion of the defendant’s guilt, even where it is alleged that [the] judge discussed his opinion with others,’ are generally considered legally insufficient reasons to warrant the judge’s disqualification.” (quoting Jackson v. State, 599 So.2d 103, 107 (Fla.1992))). Thus, this motion was properly denied.
CONCLUSION
For the reasons addressed above, we affirm the postconviction court’s denial of relief.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Williams v. State, 110 So.2d 654 (Fla.1959).